ENERGEN RESOURCES MAQ, INC., f/k/a Total Minatome Corp., Appellant,

v.

Don DALBOSCO, Appellee.

No. 01–99–00553–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 15, 2000.

Rehearing Overruled July 21, 2000.

Thomas G. Bousquet, Bousquet & Jackson, P.C., Houston, Charles B. Swanner, Houston, for Appellant.

Joe G. Roady, Houston, for Appellee.

Panel consists of Justices HEDGES, NUCHIA, and EVANS.*

## OPINION

SAM NUCHIA, Justice.

This is an appeal of a money judgment for damages and attorney's fees in favor of appellee, Don Dalbosco. Dalbosco filed this lawsuit in 1990 seeking damages resulting from appellant, Energen Resources MAQ, Inc., f/k/a Total Minatome Corporation's capping an oil well in which Dalbosco had a working interest. The trial court granted Energen's motion for summary judgment, and Dalbosco appealed. This court, in *Dalbosco v.Total Minatome Corp.*, No. 01–92–00898–CV, 1994 WL 109475 (Tex.App.-Houston [1st Dist.] Mar. 31, 1994, no writ) (not designated for publication), affirmed in part and reversed in part and remanded for trial on the issue of whether an obligation arose, by custom and usage in the oil industry, for Energen to give notice to Dalbosco of its intention to plug and abandon a non-producing well. Upon remand, a jury found that (1) custom and usage in the oil and gas industry in 1981 imposed a contractual duty on Energen to give notice to Dalbosco of its intent to plug and abandon the well; and (2) Energen failed to comply. The jury awarded Dalbosco $216,000 in damages,

---

* The Honorable Frank G. Evans, retired Chief Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

and the trial court awarded Dalbosco $140,000 in attorney's fees. We affirm.

## BACKGROUND

Dalbosco, the owner of several oil and gas leases, entered into farmout agreements with Lear Petroleum Company, whose assets were purchased by Total Minatome Corp., now known as Energen Resources MAQ, Inc. (collectively, "Energen"). Energen drilled McDuffie No. 1 Well under one of those farmout agreements. The agreement, which was executed in 1981, provided that Dalbosco could acquire a working interest in the well after the well had paid out. Other parties also had a working interest in the well. No written operating agreement was executed in connection with McDuffie No. 1 Well.

After the well paid out, Dalbosco acquired a 25 percent working interest. In August 1987, the well stopped producing in paying quantities, and in November 1987, Energen decided to plug and abandon the well. In 1990, Dalbosco filed suit against Energen claiming, among other things, that Energen had breached its contractual obligation to give notice of its intention to plug and abandon the well and to give Dalbosco an opportunity to assume the operation of the well. Dalbosco alleged that he was entitled to such notice and opportunity as a matter of right and by reason of custom and usage in the oil and gas industry.

The trial court rendered summary judgment in favor of Energen on all claims. In the prior appeal, this Court affirmed the judgment except for the issue of the existence of custom and usage in the oil and gas industry that would impose a contractual duty on Energen to give notice. We held that the existence of custom and usage was an issue of fact and remanded to the trial court for further proceedings.

## DISCUSSION

### The Exculpatory Clause

■ In its first issue, Energen contends the jury's answers to questions 1, 2, and 4 should be disregarded, arguing that the exculpatory clause of the unambiguous farmout agreement relieves Energen from any liability to Dalbosco for plugging and abandoning the McDuffie well without notice to Dalbosco, especially because Dalbosco stipulated that the written agreement was not ambiguous and did not plead ambiguity, fraud, or mistake in regard to that agreement. The clause referred to by Energen provides as follows:

> A. *Compliance with Laws and Lease Obligations:* Farmee agrees to use its best efforts to observe, perform and comply with all of the conditions and covenants, expressed and implied, of the oil and gas leases, and instruments to which such leases are subject, covering the drillsite of any well, and all laws, rules, regulations and orders, both State and Federal, relating to the ownership and enjoyment and the development and operations of the acreage covered by such leases, and Farmee will use its best efforts to maintain all rights in the acreage, but Farmee shall incur no liability to Farmor as a result of its failure to maintain the interest of both Farmor and Farmee hereunder, all or any of their rights in said acreage, or any part thereof.

Energen argues that, under this clause, Dalbosco released Energen from liability as long as Energen used its best efforts to maintain all rights in the acreage, and that there was no showing that Energen did not use its best efforts.

Dalbosco did not bring suit against Energen seeking damages for loss of any rights in the acreage. He sued for breach of a contractual duty to give notice imposed by custom and usage. The exculpatory clause does not apply to this case. We overrule Energen's first issue.

### Custom and Usage

■ In its second issue, Energen contends that the trial court should not have submitted a jury question on custom and

usage in the industry requiring notice before plugging and abandoning the McDuffie well because there was no evidence presented at trial of such a custom and usage in the industry in 1981. Jury question number one asked the following:

> Did the custom and usage in the oil and gas industry in 1981 impose a contractual duty on Defendant to provide notice to Don Dalbosco of its intent to abandon and plug the McDuffie No. 1 well before the expiration of the McDuffie lease?

The jury answered, "Yes." Energen objected to the submission of this question on the ground that there was no evidence to support the issue.

■■■■■ In reviewing a no evidence point, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Vannerson v. Vannerson*, 857 S.W.2d 659, 666 (Tex.App.—Houston [1st Dist.] 1993, writ denied). If there is any evidence of probative force to support the finding, *i.e.*, more than a mere scintilla, we will overrule the point. *Id.* When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex.1970). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence. *Kindred*, 650 S.W.2d at 63.

We first note that Energen does not challenge the sufficiency of the evidence to prove the existence of the custom and usage regarding the giving of notice to non-operators. Energen asserts only that there is no evidence showing the custom existed in 1981. Moreover, the question presented to the jury related only to 1981 and not to the existence of the custom in general. The jury question is consistent with the fact that the farmout agreement at issue was executed in 1981. Therefore, Dalbosco was required to produce some evidence from which the jury might reasonably infer that such a custom existed in 1981.

J.J. Renfro, Dalbosco's oil and gas production expert, testified as follows:

Q. Is there any notice typically given in relation to the plugging and abandoning?

A. Yes.

Q. And what is the purpose of that kind of notice?

A. Usually it costs money to plug a well. And it's just like an AFE. A working interest owner is usually required to pay his proportional cost. Now, sometimes there are other agreements made to allow a plugging company to plug it for the salvage and that sort of thing; but before the equipment that's pulled or that's left on the well is salvaged, it's offered to working interest owners in order to allow them the opportunity to purchase that equipment.

Q. Let's suppose, then, that notice has gone out ... and one of the nonoperators indicates that, no, he doesn't want the well abandoned, he wants to take it over.

> [H]as there been and is there a practice in the oil and gas industry about giving that working interest owner that opportunity?

A. Usually so, yes, sir.

Q. And what is the purpose of giving that person that kind of opportunity?

A. Well, he may see an opportunity that others don't and he may evaluate it differently or he may have different operating cost basis. It gives him an option to pick up the well. He has to buy out all the other people that don't want to go along with it, but that's the normal way of handling it.

Q. And does this kind of notice and opportunity to take over a well exist, in

your experience and your knowledge, with or without an operating agreement?

A. [I]n practice it's done with or without. It should be.

Q. Now, let's talk about a situation where the ... nonoperator ... is the one who brought the leases to the project and ... owns all the other horizons.

Is there any practice in the industry that highlights the rights of a nonoperator in that circumstance ... ?

A. Well, in a case like that, usually the person that's being carried or that's made an agreement with the operating company to take over and spend the money to drill the well— the rest of it is essentially his outside of this interval we're speaking of. And, yes, he's the one that brought them to the dance; so, they ought to dance with him.

Q. Now, are those the kind of circumstances in the oil and gas industry that any experienced operator would know about?

A. Oh, definitely.

Q. [D]oes it exist to the extent that it is common knowledge in the industry that these rights and opportunities exist?

A. Yes. In fact, that was the basis upon— you know, years ago— and I think it's still recognized— a handshake or an agreement was enough to make a contract between people and they usually do that but if it's— if it's abrogated, then there's problems come up. So, that's the reason that later on you get operating agreements and things where things are more written out, because it never seems to cover all cases.

Q. Are you familiar with the various forms of operating agreements that the American Association of Petroleum Landmen has promulgated over the years?

A. I am not sufficiently detail informed about it, but the existence of them, yes.

Q. Do you have an awareness concerning the nature of— of whether those forms were incorporated to adopt the practices and procedures that were happening in the oil business when those forms were put forth?

A. Oh, yes, yes.

Clifford Budd, another expert witness for Dalbosco, testified as follows:

Q. From your knowledge and experience in the industry, was it common knowledge in the industry that a nonoperating working interest owner would be entitled to notice of plugging and abandonment and given an opportunity to take over a well?

A. Yes, definitely.

Q. And would that be true either with an operating agreement or without an operating agreement?

A. Yes, that would be true either way.

\* \* \*

Q. Have you studied the events which have occurred in relation to the relationship between Mr. Dalbosco and [Energen] concerning the two wells in question?

A. Yes, I have.

Q. From your knowledge of those events, do you have an opinion concerning whether or not [Energen] breached its obligation to give Mr. Dalbosco the opportunity to take over the McDuffie No. 1?

MR. SWANNER: Calls for a legal conclusion, I believe, Your Honor.

THE COURT: Overruled.

A. [Energen] should have notified Mr. Dalbosco as well as all the other nonoperators.

Norman Inman, an attorney who had been employed by Energen and its predecessors, testified that the form operating agreements over the years had similar provisions regarding notice of plugging and abandoning oil wells; the operating agreement executed in 1977 by Energen

and Dalbosco contained such a provision; and the import of the provision in a 1956 form was "virtually the same."

Dalbosco testified that he had two meetings with Jeffrey Carpenter in 1981. At that time, Carpenter was landman for Energen's predecessor. Dalbosco testified as follows:

Q. In the course of the ... discussions with Mr. Carpenter, did you discuss the— the situation about wanting to take any wells at the end of their natural life when P & A was a prospect?

A. Yes, definitely.

Q. [W]as there an agreement of any sort reached between you and Mr. Carpenter on that question?

A. Yes.

Q. What was that agreement?

A. Well, the agreement was when the well would pay out. By "pay out," when everyone had put money in the well, they received all their money back, including expenses. Once the well paid out, I would have that right—

* * *

Q. Now, the question was: What was the discussion and agreement concerning what would happen at the tail end of the wells?

A. At the tail end of the wells, I would have that opportunity to take over the wells if I had a working interest in those wells.

* * *

Q. Did you, in fact, convert to a 25 percent working interest in the McDuffie lease?

A. Immediately, I did.

* * *

Q. Did you shake hands with Mr. Carpenter on the deal you made with him?

A. Yes, I did.

■ A custom is a practice so general and universal that the parties to a contract are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it. *See State Nat'l Bank of Houston v. Woodfin,* 146 S.W.2d 284, 286 (Tex.Civ. App.-Galveston 1940, writ ref'd); *see also Barreda v. Milmo Nat'l Bank,* 252 S.W. 1038, 1039–40 (Tex.1923) (stating that the general rule regarding custom and usage, in the case of contract, is that the custom and usage must be so general that both parties are presumed to be aware of the custom or usage, or that the parties have actual knowledge of the custom or usage, and the parties are charged with having contracted with reference to the custom or usage).

The testimony of Renfro, Budd, and Inman was some evidence that notice of intent to plug and abandon an oilwell was general and universal to the extent that the parties are charged with knowledge of the custom. The jury could reasonably infer that, based upon the existence of similar notice provisions in industry forms in 1956 and 1977, the custom and usage was in existence in 1981. The presumption that the parties dealt with reference to the custom was not rebutted. To the contrary, a reasonable inference could be drawn from the "handshake deal" between Dalbosco and a representative of Energen's predecessor that the parties specifically contracted with reference to the custom.

■ Energen also contends that the trial court erred in submitting a jury question on custom and usage in the industry because Dalbosco failed to request a jury question on Energen's knowledge, if any, of such alleged custom and usage.[1]

---

1. We recognize that some caselaw appears to provide for two separate jury questions: (1) whether such a custom existed (i.e., was generally known or had been established for a sufficient length of time to become generally known), and (2) whether the parties knew of the custom or contracted with reference to it. *See Texas Gas Exploration Corp. v. Broughton Offshore Ltd. II,* 790 S.W.2d 781, 785 (Tex. App.—Houston [14th Dist.] 1990, no writ);

A jury question regarding Energen's knowledge of the custom and usage was not required because, upon a showing that a custom is general and universal, the parties are presumed to know of its existence.

We overrule Energen's second issue.

### Parol Evidence

■ In its third issue, Energen contends that the trial court erred in submitting a jury question on custom and usage in the industry and in permitting the introduction of parol evidence of prior conversations because custom and usage cannot vary, control, impair, restrict, or enlarge the express language of the contract. Energen argues that the contract, by which it means the farmout agreement, is complete on its face and is unambiguous, and, therefore, parol evidence of negotiations between Dalbosco and Carpenter should not have been admitted.

■ The farmout agreement has no "entirety" clause providing that it is the complete agreement of the parties. The agreement does not address the issue of abandonment after the well casing has been run or after production has begun, and there was no written operating agreement between the parties. Evidence of custom and usage is admissible to add to a contract that is silent on a particular matter. *Oil Ins. Ass'n v. Royal Indem. Co.*, 519 S.W.2d 148, 151 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.); *see also Atlantic Richfield v. Holbein*, 672 S.W.2d 507, 515–16 (Tex.App.-Dallas 1984, writ ref'd n.r.e.)(because agreement made no provision for the volume upon which royalty payments were to be based, industry-wide standard was used); *PGP Gas Products, Inc. v. Reserve Equipment, Inc.*, 667 S.W.2d 604, 608 (Tex.App.-Austin 1984,

writ ref'd n.r.e.)(an agreement to provide insurance was implied by custom and usage although not specified in the contract). The trial court did not abuse its discretion in admitting parol evidence on this issue.

We overrule Energen's third issue.

### Damages

■ In its fourth issue, Energen contends that the jury's answer to question no. 4 on damages should be disregarded because Dalbosco offered no credible evidence as to the value of the McDuffie Well in 1988 when it was plugged and the lease terminated. Energen argues that the testimony of Budd, Dalbosco's expert, was not founded upon any reasonable scientific basis and was speculative opinion with no probative force, citing *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997).

Energen did not object to Budd as an expert witness or to his testimony as lacking scientific basis. Therefore, Energen has waived any objection to Budd as an expert witness. Budd testified at length regarding the value of the well without objection. Although Energen's witness testified that the value of the well was "zero," the jury was entitled to believe Budd. *See Murphy v. Texas Farmers Ins. Co.*, 982 S.W.2d 79, 85 (Tex.App.—Houston [1st Dist.] 1998), *aff'd*, 996 S.W.2d 873 (Tex.1999).

We overrule Energen's fourth issue.

### Attorney's Fees

■ In its fifth issue, Energen contends the trial court erred in awarding attorney's fees to Dalbosco and in denying Energen's claim to attorney's fees. Energen reasons that, because Dalbosco originally asserted 12 different claims[2] and

Corso v. Carr, 634 S.W.2d 804, 808 (Tex.App.-Fort Worth 1982, writ ref'd n.r.e.); *Arnold D. Kamen & Co. v. Young*, 466 S.W.2d 381, 386 (Tex.Civ.App.-Dallas 1971, writ ref'd n.r.e.). In our view, if a custom exists in any industry, those who operate within that industry may be presumed to know of it, and one asserting

lack of knowledge must rebut the presumption. *See Barreda*, 252 S.W. at 1039–40.

2. According to Energen, Dalbosco's 1990 lawsuit included claims for (1) breach of contract imposed by custom and usage, (2) interference with a contract, (3) malicious interference with a contract, (4) punitive damages,

prevailed on only two-breach of contract imposed by custom and usage and attorney's fees-Energen is entitled to attorney's fees as the prevailing party on 10 of the claims. Energen's complaint regarding the award of attorney's fees to Dalbosco appears to be based solely on Energen's contention that it, and not Dalbosco, was the prevailing party. This reasoning ignores the fact that Dalbosco prevailed on its breach of contract claim and was awarded a money judgment. By prevailing on this claim, Dalbosco was entitled to attorney's fees under chapter 38 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). Energen's contention that Dalbosco was not entitled to attorney's fees is without merit.

In its brief, Energen asserts the farmout agreement provides that the "prevailing party ... shall be entitled to recover reasonable attorneys' fees." However, during oral argument, Energen conceded that the farmout agreement does not contain such a provision. Thus, the farmout agreement cannot be the basis for any recovery of attorney's fees by Energen.

 Energen's reply brief, responding to arguments made by Dalbosco, implies that Energen is seeking to recover attorney's fees under chapter 38, which permits the recovery of reasonable attorney's fees if the *claim* is for an oral or written contract. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001. To recover attorney's fees under this chapter, the claimant must *present the claim* to the opposing party or its authorized agent. *Id.*, § 38.002(2). Chapter 38 does not provide for the recovery of attorney's fees by a defendant who only defends against a plaintiff's contract claim and presents no contract claim of its own. *American Airlines, Inc. v. Swest, Inc.,* 707 S.W.2d 545, 547 (Tex.1986) (holding defendant could not recover attorney's fees under predecessor to section 38.001 when

defendant presented no contract claim of its own); *Garcia v. National Eligibility Exp., Inc.,* 4 S.W.3d 887, 889 (Tex.App.— Houston [1st Dist.] 1999, no pet.).

Energen filed a counterclaim seeking a declaratory judgment to construe its rights under the 1981 farmout agreement. The trial court denied the counterclaim and Energen has not appealed the denial. There is no basis upon which Energen is entitled to attorney's fees under chapter 38.

We overrule Energen's fifth issue.

***Conclusion***

We affirm the judgment of the trial court.

(5) negligence, (6) gross negligence and wilful misconduct, (7) failure to account, (8) breach of good faith and fair dealing, (9) breach of implied covenant, (10) failure to account for salvage, (11) conversion, and (12) attorney's fees.