# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00498-CV

**271 Truck Repair & Parts, Inc., Appellant**

**v.**

**First Air Express, Inc. and Allen T. Love, Appellees**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT NO. 04-642-C368, HONORABLE BURT CARNES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this breach of contract case tried to the court, 271 Truck Repair & Parts, Inc., appeals the trial court's judgment in favor of appellees First Air Express, Inc., and Allen T. Love.[1] The central dispute at trial was the parties' agreement as to the scope of work that 271 Truck Repair was to perform on two Freightliner trucks owned by appellees. The parties offered conflicting evidence of the parties' communications and the events surrounding the dispute. The trial court, as factfinder, resolved the conflicts in appellees' favor.

In six issues, 271 Truck Repair contends that the trial court erred by finding that 271 Truck Repair breached its contract with appellees and in implying a covenant in the parties' agreement; by awarding conversion damages; by refusing to find that 271 Truck Repair was entitled

---

[1] In this opinion, we refer to First Air Express and Allen T. Love collectively as "First Air Express" or "appellees." We refer to Allen T. Love individually as "Love."

to storage fees; by awarding damages for usury; and by its attorney's fee award, including that the trial court erred in awarding appellees unconditional appellate attorney's fees. For the reasons that follow, we modify the judgment as to appellate attorney's fees, overrule 271 Truck Repair's remaining issues, and affirm the trial court's judgment, as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

First Air Express hired 271 Truck Repair in January 2004 to perform work on two Freightliner trucks, a 1997 model with a worn-out engine and a 1999 model that had been in a wreck. The scope of work included replacing the engine from the 1997 model with the engine from the 1999 model. First Air Express represented to 271 Truck Repair that the 1999 engine was in "good, operable condition" and did not need any "internal engine work."[2] The parties did not agree on a fixed price for the work, but agreed that payment would be due upon completion, i.e., no interim or progress payments would be required. 271 Truck Repair thereafter removed both engines and installed the 1999 engine in the 1997 truck.

After installing the 1999 engine in the 1997 truck, 271 Truck Repair attempted to start the engine, but it would not start. Taking the position that it only agreed to "swap" the engines, 271 Truck Repair advised First Air Express that it had completed the job and invoiced First Air Express in the amount of $7,604.92, detailing the parts and services incurred. At the bottom of each page, the invoice, dated February 5, 2004, contained language concerning payment, interest, and storage charges:

---

[2] It was undisputed at trial that the 1999 engine was as represented—it was in good operating condition and did not need internal engine repairs.

2

Payment in full at completion of job unless prior arrangements have been made. It is agreed that payment is due within the terms stated above. A service charge of 1.5% per month shall be due on unpaid balances. Please pay from this invoice. All vehicles left on property past 30 days subject to $15.00 per day storage charge.

First Air Express refused to pay the invoice, taking the position that the scope of agreed work included getting the 1999 engine, once installed in the 1997 truck, "running." Its position was that because the 1997 truck with the 1999 engine was not "running," 271 Truck Repair had not completed the job it was hired to perform and, because payment was not due until the job was complete, payment was not due. 271 Truck Repair performed no further work on the trucks from that point forward.

The parties were unable to resolve their dispute and, by certified mail dated April 26, 2004, 271 Truck Repair asserted mechanic's liens against both trucks and advised that it would be charging storage fees beginning April 1, 2004. In May 2004, Lawrence Auto Title Services, Inc., on behalf of 271 Truck Repair, sent notices to appellees that the trucks would be sold at public auction if the charges were not paid within 30 days.

To prevent the foreclosure sale, appellees filed suit against 271 Truck Repair and obtained a temporary restraining order. The parties met at the courthouse in July 2004 and reached an agreement as to how to proceed. Although the terms of this subsequent agreement were disputed at trial, it was not disputed that the parties agreed that First Air Express would hire a third party mechanic to inspect the installation and diagnose why the installed engine would not start. Shortly thereafter, First Air Express hired Dana Ayers of Bill's Truck & Trailer Repair to make the

3

inspection and diagnosis.[3]  Ayers inspected the 1997 truck, replaced its batteries with new ones provided by First Air Express, and "used ether to fire the engine which ran properly."  Ayers also determined that the installed engine did not need internal engine work.  The only problem that Ayers found was "a water hose had dry rotted and leaked when the engine was run."  First Air Express paid Ayers $362.81 for this service.

Around the time Ayers was able to start the engine, First Air Express paid $3,500 to 271 Truck Repair against the February 2004 invoice.  The parties' dispute remained unresolved, however, with 271 Truck Repair refusing to return the trucks to First Air Express unless all amounts outstanding were paid, including accrued storage charges.  In March 2005, 271 Truck Repair sent a letter to appellees that stated the balance due on the February 2004 invoice was $4,104.92, and that storage and finance charges were accruing.  The stated accrued balances were $5,220 for storage fees and $876.18 for finance charges.  271 Truck Repair included with the letter an invoice dated

---

[3] The parties stipulated to certain facts at trial concerning the third party mechanic:

Pursuant to agreement between F.A.E. and 271, Dana Ayers of Bill's Truck & Trailer Repair was hired and paid by F.A.E. to inspect the engine installation performed by 271 on the [1997] Freightliner and to get the engine started.

On 22 July, 2004, Mr. Ayers inspected the [1997] Freightliner at your shop, at 271, and found that the installation had been performed correctly.  He then replaced—he replaced the batteries with new ones provided by F.A.E. and used ether to fire the engine which ran properly.  The only problem found was that a water hose had dry rotted and leaked when the engine was run.

Bill's Truck & Trailer Repair, Inc., charged F.A.E. the sum of $362.81, which F.A.E. paid for the work and was performed—which paid for the work performed at 271.  F.A.E. has not paid 271 in full on the invoice which is numbered 13351 [the February 2004 invoice], nor has F.A.E. requested a credit in the amount of 362.81.

February 5, 2005, for its accrued finance charges and an invoice dated February 16, 2005, for the storage fees. 271 Truck Repair eventually sold the 1997 truck in January 2006 for $2,500, and a grass fire destroyed the 1999 truck while it was in 271 Truck Repair's possession.

The parties' dispute continued, eventually leading to the bench trial in October 2007. Appellees sought damages under three theories of recovery—breach of contract, usury, and conversion. 271 Truck Repair, by counterclaim, sought damages under two theories of recovery—breach of contract and for unrecovered funds pursuant to Chapter 70 of the Texas Property Code. Although the parties stipulated to certain facts, Patrick Kivett, owner of 271 Truck Repair, and Love, president of First Air Express, provided conflicting testimony about the parties' agreement and the events surrounding the parties' dispute. Other witnesses included David Morrison, the person who delivered the two trucks to 271 Truck Repair on behalf of First Air Express; Frances Duron, the loss prevention manager for First Air Express; and George Culver, the 271 Truck Repair mechanic who oversaw the work that 271 Truck Repair performed on the trucks.

The trial court found in appellees' favor on their breach of contract and usury claims, entering judgment for actual damages in the amount of $20,862.70, and for attorney's fees in the amount of $10,206.25, plus an additional $5,000 in the event of appeal to the court of appeals, and $5,000 in the event of appeal or petition to the Texas Supreme Court. The damages award to appellees included the cost of the third party mechanic, the fair market value of the 1997 truck,[4] an amount three times the amount of usurious interest charged, and pre-judgment interest. The trial court offset these amounts by the outstanding balance that appellees owed to 271 Truck Repair under

---

[4] The trial court did not award damages to appellees for the loss of the 1999 truck.

the February 2004 invoice, but the trial court did not allow any offset for interest or storage fees. The trial court thereafter entered findings of fact and conclusions of law.[5] This appeal followed.

## ANALYSIS

### *Standard of Review*

In an appeal from a bench trial, the trial court's findings of fact "have the same force and dignity as a jury's verdict upon questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Ludwig v. Encore Med., L.P.*, 191 S.W.3d 285, 294 (Tex. App.—Austin 2006, pet. denied). The trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id.* at 697.

This Court reviews a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson*, 806 S.W.2d at 794; *Ludwig*, 191 S.W.3d at 294. When reviewing a finding for legal sufficiency, the reviewing court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). When considering a factual sufficiency challenge, the reviewing court considers

---

[5] After the trial court entered findings of fact and conclusions of law, 271 Truck Repair requested additional or amended findings of fact and conclusions of law, which request the trial court rejected.

all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

This Court reviews conclusions of law *de novo*. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). "The appellant may not challenge a trial court's conclusions of law for factual sufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness." *Id*. (citations omitted).

### Breach of Contract

In its first issue, 271 Truck Repair contends that the trial court erred in finding that 271 Truck Repair breached its contract with appellees and in implying a covenant that the installed engine be in operable condition.[6] 271 Truck Repair asserts that the written work order is

---

[6] As to 271 Truck Repair's first issue, the trial court entered the following findings of fact and conclusions of law:

Findings of Fact

2.  Plaintiffs entered into an oral contract with Defendant whereby Defendant would remove the engine from the 1999 Freightliner truck and install the engine in the 1997 Freightliner truck.

3.  There was not a written contract or work order concerning the replacement of the engine.

4.  The agreement to replace the engine in the 1997 Freightliner with the engine from the 1999 Freightliner implied that the engine would be transferred and connected and hooked up so as to be in operable condition.

\* \* \*

7

the written contract between the parties, that it is unambiguous and controlling, that the trial court should have considered evidence of custom and usage in the vehicle repair industry that no repairs are performed unless authorized to do so, and, if the work order did not establish the existence of

6.     Defendant did not make all the necessary connections and hookups to assure that the engine was operable after it was transferred to the 1997 Freightliner.

* * *

10.    Plaintiffs and Defendants [sic] entered into a second agreement whereby Plaintiffs paid to Defendants [sic] the sum of $3,500.00; the Defendant agreed to complete the installation of the engine in the 1997 Freightliner; and, Defendant would be entitled to additional sums for their work.

* * *

12.    The engine installation in the 1997 Freightliner was not completed.

* * *

14.    Defendants [sic] refused to surrender possession of the trucks without payment of the outstanding balance and payment of claimed storage fees and finance charges.

15.    The Plaintiffs never entered into an agreement to pay storage fees or finance charges.

* * *

20.    Defendant breached both oral contracts.

Conclusions of Law

1.     Plaintiff and Defendant entered into a valid oral contract.

2.     Defendant breached the contract.

3.     Plaintiffs are entitled to recover their damages plus prejudgment interest plus attorney's fees less the offsets due to Defendant on Defendant's counterclaim.

8

the agreement between the parties, that the oral agreement was to "swap engines." Alternatively, 271 Truck Repair argues that it substantially performed its obligations under the parties' agreement.

"The elements of a valid contract include: (1) an offer; (2) acceptance; (3) meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 465 (Tex. App.—Dallas 2006, pet. denied) (citation omitted). "In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding the communications." *Id*. The existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence. *PGP Gas Products, Inc. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.). 271 Truck Repair does not dispute that it entered into a contract with appellees in which 271 Truck Repair agreed to perform services on the trucks and appellees agreed to pay for the work once completed. The dispute concerned the terms of the contract, particularly the scope of work.

271 Truck Repair contends that the work order was the written agreement between the parties and that the work order is limited to "swapping" the engines. The work order stated the work to be performed as follows:

> Take Eng out of wrecked Trk
>     Good Eng/Oil Pan Cracked
> Take Eng out of Other Trk
>     Use Oil Pan for Good Eng.

Kivett testified that he "fill[ed] out" the work order at the time Morrison brought the trucks to 271 Truck Repair, but no party signed the work order, and the customer listed on the work order is

9

"Iron Horse Heavy Haul."[7] Kivett testified that the parties did not have a written agreement,[8] and as to the work order, that "[i]t's just a verbal thing. You know, 'Hey, can you fix my AC? Hey, can you swap engines?'" There also was no evidence that appellees were provided a copy of the work order. We conclude that this evidence is legally and factually sufficient to support the trial court's finding that there was no written contract or work order between the parties concerning their dispute. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind.").

As to the oral agreement between the parties, the parties testified to their understanding of the terms of the agreement entered into at the beginning of the transaction. *See Cessna*, 213 S.W.3d at 465. Culver and Kivett both testified that 271 Truck Repair only agreed to "swap" the engines.[9] Their testimony, however, conflicted with the testimony of Morrison and Love. Morrison testified to his initial communications with 271 Truck Repair and that the scope of

---

[7] Morrison testified that he was working for Iron Horse Heavy Haul at the time, and that Iron Horse Heavy Haul was doing work for Love.

[8] Kivett testified:

Q.    . . . You testified earlier that you did not have a written agreement with F.A.E. or Mr. Love regarding the work on these trucks; is that correct?

A.    Not a written one, no.

[9] Kivett testified that getting the engine to run would have been a separate work order:

Well, we told [Morrison] ahead of time that we weren't doing any engine work. We were told it was a good running engine and that we were to swap the engines, the good running one out of the wrecked truck and put it into the [1997] which had a bad engine in it, put it in there, and that we didn't have to do anything else. And that's what we stuck to. Once it's—we completed our job of swapping the engines. Once it didn't fire up, that's a whole different work order.

10

work from the beginning was to install the 1999 engine in the 1997 truck and to get the installed engine "running":

> Q. Okay. What did you—what was your discussion with what was supposed to happen to the trucks? Just to swap the engines?

> A. It was to take the good engine, or the supposed good engine, out of the one truck that had been running before and put it into the other truck and to—so we could use it.

> Q. And—

> A. —or it could be used, per se.

> Q. And was part of that work to include getting the engine running?

> A. Yes.

> Q. How important was it that the engine ran afterwards, after the swap?

> A. It wouldn't—you wouldn't do the swap if you weren't going to plan on having the engine running.

Love testified: "And that was the agreement at the beginning, swap the engines and make the truck run."

The testimony of Culver and Kivett was also inconsistent with the parties' subsequent conduct and 271 Truck Repair's February 2004 invoice. Kivett testified that 271 Truck Repair did "try to crank it [the installed engine] and see if we could get it started," but that when it would not start, they "weren't going to spend any more money since it didn't seem like we were going to get any help on the financial end of it." Kivett also testified that during the time period when 271 Truck Repair was working on the trucks—"roughly a month or a little over," "Morrison was in our shop

11

every other day, every other week" and that "he authorized all work" on the 1997 truck during that time, including air conditioning work and the purchase of parts including "the starter, the transmission." The February 2004 invoice reflected the work 271 Truck Repair performed detailing its charges for parts and services provided, including air conditioning work and replacing worn parts. These charges reflected work that was in addition to "swapping" the engines.[10]

There was also evidence that the parties entered into a subsequent oral agreement that appellees would pay $3,500 and then the balance of the February 2004 invoice once the truck was "running." Love testified to the subsequent agreement reached by the parties at the courthouse:

---

[10] For example, there was testimony that the charges for air conditioning work were additional. Although Culver provided contrary testimony, Kivett testified that the air conditioning work was not required to complete the engine "swap":

Q.     The AC work was not required to complete the swap; is that correct?

A.     Correct.

Love also testified that he had a conversation with Kivett after he received the foreclosure notices in which he discussed why the engine would not run and why he was charged for air conditioning:

. . . And after I got these notices, I did have a conversation with—and I had the invoice. I had a telephone conversation with Mr. Kivett. And I asked Mr. Kivett why wouldn't the truck run, what's going on, why couldn't we get the truck running. At that point in time he said that they had actually had the truck running for just a short while but couldn't get it to run again. And I said, "Well, you know, I'll be happy to pick up the truck and pay you when the truck is running." And at that point in time that's when I—on the invoice—I had reviewed the invoice and discussed the AC system on the invoice in the same conversation. And I said, "Why if the truck is not running—why did you spend all this money on parts putting the AC system on there?" And his response was, "Well, I thought you needed it. It's hot in Texas." I do recall that.

Actually, we met here at the courthouse. It was myself, Fran Duron, David Morrison, Pat Kivett, and Mark Silverstone [appellees' attorney]. And in the meeting, actually we never got into the hearing. We basically met outside the courthouse, sat down, and came to an agreement that we'd stop everything. At that point in time I asked Pat—I says, "Pat, what are the issues here?" I said, "You're trying to sell the trucks. You want to be paid, but the truck's not running. All I want is the truck running." And he said, "Well, Tommy, I haven't gotten any money." And I said—at that point in time I looked at him, and I said, "You know, you get the truck running. Tell me how much money you need." And he came up with $3,500.00. He said that's approximately what he was out in parts. I said, "Fine. I will issue you a check for $3,500.00. I'll authorize that." And I said at that point in time, "I will pay you the balance after the truck is running." And that was our agreement, and we all walked away.

* * *

At that point in time I said, "Now, the $7,600.00, the invoice here, is what we agreed on?" And then Pat said yes.

Although Kivett provided contrary testimony of the parties' agreement at the courthouse, Love's testimony was consistent with appellees' conduct in not pursuing a temporary injunction after obtaining a temporary restraining order from the trucks being sold in foreclosure.[11]

Love also testified to the circumstances surrounding the third party mechanic and appellees' payment of $3,500:

Actually, I—as I recall, when I talked to Pat, I said, "If you can't get it running, maybe we can get someone else." And I do use Bill's Truck & Trailer from time to time out of the Bastrop area, and they are pretty good. I have had good luck with them. And I suggested, "Why don't I send them up and see if we can get the truck running?" And Pat agreed to that. So we did.

_____

[11] As to the subsequent agreement at the courthouse, Kivett testified that: "There was no agreement. It was agreed that we had done nothing wrong in the swapping of the engines. And we offered for him to come out and hire anybody he so choose to verify that that was still a good running engine. We were completed with our task of swapping the engines."

13

Love testified that he met the third party mechanic at 271 Truck Repair and that, around the time the third party mechanic was able to start the engine, appellees paid $3,500 instead of the entire invoice because there was remaining work to complete the engine installation at that time:

> Because the truck was not complete. Bill [Bill's Truck & Trailer Repair] got it running, but you still had—they still hadn't put clamps on my hoses. It was sitting there. Bill had to—he shut the engine off real quick because it wasn't ready to go. I said "Get the truck completed where the engine will sit here and run without getting hot. You know, put water, antifreeze in it, get it up to par where it should be, and I will pay."

Love also testified that at that time 271 Truck Repair agreed to complete the remaining "minor work"—that Kivett agreed to "tighten everything up and get everything running, and he would have it ready to go in a couple of days." Kivett, however, testified that no further work was performed on the truck after the February 2004 invoice.

Kivett testified that after the third party mechanic started the engine, Love told 271 Truck Repair that he would be "back in a couple of days to pick up the truck and pay the remaining balance," but that Love was "probably" told that First Air Express could not have the truck unless "they also paid storage fees." Love testified that appellees were "willing to pay" the February 2004 invoiced amount, but not storage or interest charges, and "that's when it started falling apart." Duron similarly testified that she contacted 271 Truck Repair after the $3,500 payment was made and that it was Love's intent to pay the outstanding balance, but that there were invoiced amounts that First Air Express did not agree to pay.

The trial judge, as factfinder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard*, 722 S.W.2d at 696-97. Crediting the

14

testimony of Love, Morrison, and Duron and the parties' stipulations, the evidence presented in support of the trial court's conclusion of law that 271 Truck Repair breached the oral contract shows that the parties did not enter into a written agreement but oral agreements, and that 271 Truck Repair breached the parties' oral agreements by failing to complete the work, charging interest and storage fees that were not part of the parties' agreements, and then refusing to return the trucks after appellees tendered performance.

In support of its position that it did not breach the parties' agreement, 271 Truck Repair contends that custom and usage in the vehicle repair industry is that repairs must be specifically authorized. "Evidence of custom and usage is admissible to add to a contract that is silent on a particular matter." *Energen Resources MAQ, Inc. v. Dalbosco*, 23 S.W.3d 551, 557 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). Love and Morrison both testified that First Air Express specifically authorized 271 Truck Repair to install the engine and to get it "running." Whether or not custom and usage in the vehicle repair industry is that repairs have to be specifically authorized, the trial court, as factfinder, could have credited the testimony of Love and Morrison that First Air Express specifically authorized 271 Truck Repair to get the engine "running." Evidence of custom and usage in the vehicle repair industry does not support 271 Truck Repair's position that it did not breach the parties' agreement.

Alternatively, 271 Truck Repair contends the trial court erred in concluding that 271 Truck Repair was in breach because it substantially performed its obligations under the parties' agreement. The doctrine of substantial performance allows a party to a contract, who is itself in breach but who nevertheless substantially completed performance, to recover damages for that performance. *See Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) (building contract context).

15

But, the trial court awarded 271 Truck Repair damages for its performance under the parties' agreement by awarding damages to 271 Truck Repair on its counterclaim for the balance owed under the February 2004 invoice. 271 Truck Repair was compensated for the parts and services that it provided.

Further, the trial court's damage award to 271 Truck Repair on its counterclaim does not conflict with its findings of fact and conclusions of law that appellees were entitled to damages for 271 Truck Repair's breach of the parties' agreement. The evidence presented in support of the trial court's finding shows that the parties' agreement was that payment was not due until 271 Truck Repair completed the work. The parties stipulated that "271 Truck Repair did not perform any work to get the engine to start." The trial court could have credited the testimony that the scope of work included getting the installed engine in "running" condition before appellees had an obligation to pay, the testimony that appellees remained willing to pay the February 2004 invoice once the work was completed, the testimony that the 1999 engine did not need internal engine work,[12] the repairs

---

[12] On cross-examination, Kivett testified as to the condition of the 1999 Freightliner engine and why 271 Truck Repair performed no further work on the engine once it would not start:

Q. So there was nothing wrong with the engine from the [1999] Freightliner? It was exactly as represented by F.A.E.?

A. Correct.

Q. Didn't need any internal engine work, did it?

A. No.

Q. Isn't it true that had 271 done what Mr. Ayers did there would be no problem, we wouldn't have had this lawsuit?

that the third party mechanic undertook to start the engine, and appellees' loss of its trucks.  This evidence supports the trial court's findings of fact and conclusion of law that 271 Truck Repair breached the parties' oral contract by failing to complete the work, refusing to return the trucks, and causing loss to appellees.

We conclude that the evidence was legally and factually sufficient to support the trial court's findings of fact concerning the scope of work and 271 Truck Repair's breach, and that

---

A.    Yes.  But we were requesting debt relief on a $7,000.00 bill.  Our bills are not normally under 2,000.00 [sic].  And when it gets to be 7,000, I requested from David Morrison to give us some debt relief.  And Mr. Morrison said that would be no problem.  This was all along while putting parts on that were adding up that we've paid for.  We got no debt relief.  So once we did the job as completed and said if they wanted us to get that engine to fire up and run, that would have been a whole different—we had no idea what was wrong with that engine.

Q.    Didn't you testify just a few minutes ago that there was no agreement for progress payments or any other payments up until—as a matter of fact, I believe you testified that payment was due when the job was complete?

A.    As normal, yes.  But we requested, which is not unheard of, for some debt relief on a bill that's $7,000.00.

Q.    But there was no agreement for that; is that correct?

A.    No.  It was a request and none forthcoming.  So at the end of the job, we weren't going to waste any more time or money until the bill was paid.

17

the trial court did not err in its corresponding conclusions of law.[13] We overrule 271 Truck Repair's first issue.

***Conversion Damages***

In its second issue, 271 Truck Repair contends that the trial court erred in awarding conversion damages to appellees because "271 Truck Repair had a valid lien on the trucks and the evidence was factually insufficient to invalidate that lien by the trial court's finding that a second agreement was entered into between the parties in July 2004." The trial court, however, did not find that 271 Truck Repair converted the trucks or that the liens were not valid. The trial court awarded damages to appellees based on appellees' breach of contract and usury claims. The trial court also recognized the proceeds from the truck foreclosure sale in its damages calculations.[14] Awarding

---

[13] Because we conclude the evidence supports the trial court's finding that the parties "entered into a second agreement" whereby appellees would pay $3,500 and 271 Truck Repair would complete the installation and the trial court's finding that the "engine installation in the 1997 Freightliner was not completed," we need not address 271 Truck Repair's contention that the trial court erred in its finding that the initial agreement to replace the engine implied a covenant that the engine would be transferred and connected and hooked up so as to be in operable condition.

[14] Findings of fact 19, 21, 22, and 23 set forth the trial court's calculation of its damages award:

19.  The fair market value of the 1997 truck at the time Defendants [sic] sold it was $16,650.00.

21.  Plaintiffs' damages are as follows:

Fair market value of the 1997 Freightliner truck.........$16,650.00
Plus Bill's, Inc. invoice................................................$ 362.81

TOTAL                  $17,012.81

22.  Plaintiffs are entitled to prejudgment interest.

18

damages for the loss appellees sustained was the correct measure of damages for breach of contract. *See Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (measure of damages for breach of contract is just compensation for the loss or damage actually sustained, commonly referred to as the "benefit-of-the-bargain" damages). The damages award compensated appellees for their loss, the value of the 1997 truck at the time it was sold, and the cost of the third party mechanic. *See id.*

271 Truck Repair contends alternatively that the damages award, whether based on breach of contract or conversion, should be reduced to zero because the evidence on the 1997 truck's fair market value was speculative. *See Lefton v. Griffith*, 136 S.W.3d 271, 277 (Tex. App.—San Antonio 2004, no pet.) ("There can be no recovery for damages which are speculative or conjectural.") (citation omitted). Love testified that he had been in the trucking business for approximately twenty years and that he had purchased and sold 400 to 500 trucks. He testified to the 1997 truck's condition, estimated the fair market value at the time of loss as $25,000, and provided the basis for his estimate. Kivett also provided testimony as to the truck's value, estimating the fair market value as $8,300, and the basis for his estimate. Based on the foregoing

---

23.    Defendant is entitled to recovery on its counterclaim as follows:

    Parts and Labor............................................................$ 7,604.92
    Less Payment..............................................................$ 3,500.00
    Less Proceeds of Sale.................................................$ 2,500.00

    For a total recovery of  $ 1,604.92

271 Truck Repair requested that the trial court enter an additional finding of fact that "Defendant is not entitled to recover on its counterclaim for unrecovered funds pursuant to Chapter 70 of the Texas Property Code." The trial court rejected this request.

19

testimony, we conclude the evidence at trial was legally and factually sufficient to support the trial court's finding that the 1997 truck had a fair market value of $16,650 at the time it was sold. *See id.*; *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied) (factfinder has discretion to award damages within the range of evidence presented at trial). We overrule 271 Truck Repair's second issue.

### *Storage Fees*

In its third issue, 271 Truck Repair contends that the trial court erred "in refusing to find that 271 Truck Repair was entitled to storage fees based on industry custom."[15] The trial court found that the "Plaintiffs never entered into an agreement to pay storage fees." 271 Truck Repair relies on Love's testimony that he had experience in the trucking industry, testimony that 271 Truck Repair previously provided a copy of its standard invoice to First Air Express that included language authorizing storage fees, and testimony that the industry custom was that storage fees accrue on vehicles left past 30 days. As discussed, evidence of custom and usage in an industry may be used when a contract is silent on a particular term, *see Energen*, 23 S.W.3d at 557, but it may not be used to contradict an express term in a contract, *see Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 598 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (custom and usage may not be used to contradict contract's express terms). In this case, the trial court could have credited Love's

---

[15] 271 Truck Repair challenges finding of fact 24 and conclusion of law 5:

24.    Defendant is not entitled to recovery of storage fees.

* * *

5.    Defendants [sic] are not entitled to recover storage fees.

testimony that the parties did not agree to storage fees to preclude using custom and usage to allow

271 Truck Repair to accrue storage fees.[16] *See id.* We overrule 271 Truck Repair's third issue.

## *Usury*

In its fourth issue, 271 Truck Repair contends that the trial court erred in awarding

$2,628.54 in damages for usury.[17] 271 Truck Repair argues that it does not fall within the definition

of "creditor" in the penalty provision of the usury statute and only "creditors" are liable for usury.

*See* Tex. Fin. Code Ann. §§ 301.002(a)(3), 305.001 (West 2006).[18] We review questions of statutory

---

[16] 271 Truck Repair began accruing storage fees in April 2004. Crediting the testimony that 271 Truck Repair did not complete the work and that the engine was not started until July 2004, even had the parties agreed to storage fees, 271 Truck Repair would not have been entitled to storage fees prior to the completion of the work.

[17] In its fourth issue, 271 Truck Repair challenges findings of fact 14 and 15, *see* note 6 *supra*; findings of fact 16, 25, and 26; and conclusion of law 6:

> 16. Plaintiffs refused to pay the storage fees and finance charges.
>
> * * *
>
> 25. There was no written contract authorizing Defendant to charge finance charges in excess of 6% per annum on past due balances.
>
> 26. Defendant charged Plaintiffs interest on a past due balance at the rate of 18% per annum.
>
> * * *
>
> 6. Defendants [sic] charged a usurious interest rate which entitled Plaintiffs to recover three times the amount of legal interest.

[18] The essential elements of a usurious transaction are: "(1) a loan of money, (2) an absolute obligation to repay the principal, and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc.,* 877 S.W.2d 285, 287 (Tex. 1994); *Domizio v. Progressive County Mut. Ins. Co.*, 54 S.W.3d 867,

21

construction *de novo*.  *See City of San Antonio v. Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).  We begin with the plain language of the statute at issue and apply its common meaning.  *Id*.  Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result.  *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999).

271 Truck Repair argues that the persons subject to penalty under section 305.001 was narrowed by amendment in 1999.  Prior to 1999, the penalty provision applied to a "person who contracts for, charges, or receives interest that is greater than the amount authorized."  *See* Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 222, 252.  In 1999, section 305.001 was amended to substitute "creditor" for "person."  *Id*., 1999 Tex. Gen. Laws at 233 (codified at Tex. Fin. Code Ann. § 305.001).  The amendments also defined "creditor" to mean "a person who loans money or otherwise extends credit."  *See id*., 1999 Tex. Gen. Laws at 222 (codified at Tex. Fin. Code Ann. § 301.002(a)(3)).  We conclude that the statute as amended is not ambiguous and that the plain meaning of "creditor" includes suppliers of goods or services when they charge interest on past due amounts.[19]

872 (Tex. App.—Austin 2001, pet. denied).  271 Truck Repair does not challenge that its "finance charge" was usurious subjecting it to penalty if it is a "creditor."  The parties stipulated: "271 charged simple interest at the rate of 1.5 percent per month against amounts past due."  Kivett testified that 271 Truck Repair did not have a written agreement with First Air Express to charge interest and that it charged interest from April 5, 2004, through August 16, 2004, on the entire balance of the February 2004 invoice, and from August 16 through February 5, 2005, on the balance owed after the $3,500 payment was made.

[19]  This Court, as well as our sister courts, has held suppliers of goods or services that charge interest on past due invoices liable for usury penalties.  *See Strasburger Enters., Inc. v. TDGT Ltd. P'ship*, 110 S.W.3d 566, 574 (Tex. App.—Austin 2003, no pet.); *William C. Dear & Assocs., Inc. v. Plastronics, Inc.*, 913 S.W.2d 251, 253-54 (Tex. App.—Amarillo 1996, writ denied); *Douglas*

22

In its March 2005 letter to appellees, 271 Truck Repair set out the balance due, $4,104.92, on the February 2004 invoice, a finance charge of $876.18, and storage fees of $5,220. 271 Truck Repair also generated an invoice for the finance charge, dated February 5, 2005. 271 Truck Repair's finance charge on the balance due was for the "detention of money," placing 271 Truck Repair within the definition of a creditor, as "a person who loans money or otherwise extends credit." *See* Tex. Fin. Code Ann. § 301.002(a) (interest defined to include "detention of money"). We overrule 271 Truck Repair's fourth issue.

***Attorney's Fees***

In its fifth issue, 271 Truck Repair contends that the trial court erred in awarding $10,000 in unconditional appellate attorney's fees.[20] 271 Truck Repair seeks to reform the award to $5,000 in the event this Court affirms the judgment contending appellees only requested $5,000. 271 Truck Repair also contends that any award of appellate attorney's fees to appellees must be conditioned upon an unsuccessful appeal by 271 Truck Repair.

---

*Electronics, Inc. v. Pinnacle Systems, Inc.*, 805 S.W.2d 852, 856-57 (Tex. App.—Corpus Christi 1991, no writ); *Commerce, Crowdus & Canton, Ltd. v. DKS Constr., Inc.*, 776 S.W.2d 615, 616-18 (Tex. App.—Dallas 1989, no writ).

[20] As to 271 Truck Repair's fifth issue, the trial court entered the following findings of fact:

27.    Plaintiff's attorney testified to attorney's fees of $10,206.25 through trial with an additional $5,000 in the event of an appeal to the Texas Court of Appeals and an additional $5,000 in the event of an appeal to the Texas Supreme Court.

28.    Defendants [sic] did not challenge or dispute the amount of Plaintiffs' claimed attorney's fees.

Pursuant to the statute governing attorney's fees in breach of contract actions, the trial court is given discretion to award a reasonable fee and, in a proceeding before the court, may take judicial notice of usual and customary fees. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, .004 (West 1997); *Lee v. Perez*, 120 S.W.3d 463, 469 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A trial court also may draw on its own expertise to determine an attorney's fee award. *See Thomas v. Thomas*, 917 S.W.2d 425, 437 (Tex. App.—Waco 1996, no writ).

The parties stipulated to the reasonableness of attorney's fees, and appellees submitted an affidavit from their counsel that included provision for appellate fees:

> $5,000, for defending an application for writ of error or an appeal to the Court of Appeals, for making or responding to an application for writ of error to the Texas Supreme Court or for an appeal to the Texas Supreme Court in the event application for writ of error is granted.

The trial court also could have drawn on its own expertise in determining the amount of appellate fees to award to appellees. *Id*. We conclude that the trial court was within its discretion in awarding appellees $10,000 in appellate fees.

As to the unconditional nature of the appellate attorney's fees awarded, appellees contend that 271 Truck Repair waived this issue by failing to object to the trial court. *See* Tex. R. App. P. 33. 271 Truck Repair correctly contends, however, that a party is not entitled to an unconditional award. *See A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 707 n.1 (Tex. 2007) (court of appeals properly reformed unconditional grant of appellate attorney's fees to condition the award on an unsuccessful appeal); *Thomas v. Cornyn*, 71 S.W.3d 473, 491 (Tex. App.—Austin 2002, no pet.) (judgment modified to condition award of appellate attorney's fees on success); *Texas*

*Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 400 (Tex. App.—Dallas 2000, pet. denied) ("An unconditional award of appellate attorneys' fees is improper."). "This error does not require reversal, however, but only that the judgment be modified to condition the award of attorneys fees on the party succeeding on appeal." *Cornyn*, 71 S.W.3d at 491. We conclude that the trial court erred in awarding unconditional appellate attorney's fees and sustain that portion of 271 Truck Repair's fifth issue.[21]

## CONCLUSION

For these reasons, we modify the judgment to condition the trial court's award of appellate attorney's fees to appellees on an unsuccessful appeal by 271 Truck Repair, we overrule 271 Truck Repair's remaining issues, and we affirm the trial court's judgment, as modified.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Modified and, as Modified, Affirmed

Filed: June 11, 2008

---

[21] In its sixth issue, 271 Truck Repair seeks the award of attorney's fees in the event it is successful on appeal. Because we affirm the trial court's judgment as modified, we overrule 271 Truck Repair's sixth issue.