# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 9, 2025

Lyle W. Cayce
Clerk

———————

No. 23-20567

———————

MIECO L.L.C.,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

Targa Gas Marketing L.L.C.,

*Defendant—Appellee/Cross-Appellant*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-1128

———————————————————————

Before Elrod, *Chief Judge*, and Higginbotham and Southwick, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

This is a contract dispute involving the delivery of natural gas during Winter Storm Uri in 2021. Targa Gas Marketing L.L.C. delivered less than the contracted amount of gas to MIECO L.L.C. Targa sought a declaratory judgment excusing its non-performance based on *force majeure*; MIECO counterclaimed for breach of contract. The district court granted Targa partial summary judgment, holding *force majeure* excused its obligations under the contract. The case proceeded to trial on the separate question of how to price gas that MIECO delivered to Targa under two other contracts.

The jury returned a verdict favorable to MIECO, and the district court entered judgment. Both parties appeal from the unfavorable portions of the judgment. We AFFIRM the part of the judgment that is based on the jury verdict, REVERSE the partial summary judgment as to the applicability of the *force majeure* provision, and REMAND for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

MIECO and Targa buy and sell natural gas. In 2010 they signed a base contract to govern their future gas transactions. The base contract used a form created by the North American Energy Standards Board ("NAESB"), which describes itself "as an industry forum for the development and promotion of standards which will lead to a seamless marketplace for wholesale and retail natural gas and electricity." *About NAESB*, N. Am. Energy Standards Bd., https://www.naesb.org/aboutus.asp (last visited on Dec. 9, 2025). The contract is an agreement that outlines industry-approved understandings and practices. The base contract does not compel either party to buy or sell gas, but it does contain the basic terms governing future transactions.

The relevant terms and delivery obligations for this dispute are detailed in two separate "transaction confirmations" that were executed on October 1, 2020. In one, Targa agreed to sell MIECO 15,000 British thermal units (MMBtu) of gas each day from November 1, 2020, through March 31, 2021, at a fixed "First-of-Month" (FOM) price. In the other, Targa was required to deliver 30,000 MMBtu per day at a variable, daily index price as published by *Gas Daily*. Such daily purchases are described as being in the "spot market." Their agreed-upon delivery location was the NNG Demarc pool in northeastern Kansas. This litigation does not question Targa's performance under these agreements except for six days during Winter Storm Uri. The storm caused significant disruptions in supply due to power

outages and the shutting down of equipment. According to the Department of Energy, production of natural gas dropped 21 percent nationwide during the storm. Targa did not deliver the required 45,000 MMBtu of gas each day from February 15 until February 20, 2021. Instead, it delivered 9,375 MMBtu on February 15; none on February 16, 17, 18, and 20; and 3,164 MMBtu on February 19.

The parties' base contract allowed interruptions in performance without liability when the interruption was caused by *force majeure*. The contract described that term as a "cause not reasonably within the control of the party claiming suspension." These are the relevant *force majeure* contractual provisions:

> **11.1.** [N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by *Force Majeure*.

> **11.2.** *Force Majeure* shall include, but not be limited to . . . (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; . . . [and (vi) a claim of *Force Majeure*, as described in clauses (i) through (v) above, by an Affiliate supplying or receiving the Gas delivered or to be delivered under this Contract].[1] Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a *Force Majeure* and to resolve the event or occurrence once it has occurred in order to resume performance.

> **11.3.** Neither party shall be entitled to the benefit of the provisions of *Force Majeure* to the extent performance is affected by any or all of the following circumstances: . . . (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with

---

[1] Clause (vi) was in an addendum to the base contract.

reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price . . . ; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.

Targa invoked the agreement's *force majeure* provisions on February 17, 2021, crediting (1) a weather-related event affecting an entire geographic region beginning on or around February 12 and (2) the declaration of *force majeure* by Targa's affiliates. MIECO also gave notice of a possible *force majeure* interruption in its obligations based on the extreme weather. The record indicates that MIECO continued to comply with its contracts despite that initial notice. MIECO also rejected Targa's claim of *force majeure* because it did "not consider [Targa's] notices to include sufficient detail or particularity to explain the failure to deliver natural gas or why replacement gas could not be obtained for the delivery obligations."

Pursuant to a different agreement between these parties, buyer and seller were reversed, and MIECO delivered gas to Targa. In the invoice for those deliveries, MIECO offset the $16,644,296.50 Targa admittedly owed for that gas by the amount MIECO claimed, but Targa disputed, it owed for the gas Targa delivered to it under the two transaction confirmations at issue here. The net that MIECO calculated in the invoice to be paid by Targa was $2,640,903.75. Targa insisted MIECO owed more. The difference reflects MIECO's argument that the gas it received from Targa should have been billed only under the lower-priced FOM contract because less than the contracted-for FOM quantity was delivered. According to Targa, the amount of gas it delivered to MIECO should be allocated *pro rata* between the FOM contract and the much more costly *Gas Daily* contract. Targa's allocating part of the delivery to each contract, then subtracting that new total

price from the $16,644,296.50 it owed MIECO, resulted in a balance of $19,684. Targa voluntarily paid that.

Targa sued MIECO in Texas state court, seeking a declaration that *force majeure* excused its failure to provide the contracted-for quantities of gas for the few days of the winter storm. MIECO removed the case to the United States District Court for the Southern District of Texas based on diversity jurisdiction. It asserted a counterclaim for breach of contract. Targa moved for partial summary judgment, contending the *force majeure* provisions in Section 11 of the contract excused its performance under the FOM and *Gas Daily* contracts. MIECO also moved for summary judgment, arguing (1) Uri was not a *force majeure* event; (2) even if it were, Uri did not "cause" Targa's non-delivery; (3) Targa should have bought replacement gas; and (4) Targa was obligated to allocate the available gas *pro rata* among its customers.

The district court granted Targa partial summary judgment, holding "that Uri was a *force majeure* event as it pertains to Targa's obligations under the Contract and that the Contract did not require Targa to purchase replacement gas." The district court explained that the gas volume at "Targa and its affiliate gas pro[c]essing plants fell in production by 80%," and that Targa sent a notice to MIECO stating: "The gas supply for our sale to you is being or would have been sourced from facilities (including facilities owned or operated by Targa's affiliates) which are experiencing these *force majeure* events." The district court then concluded that the production disruptions by Targa's affiliate suppliers excused Targa's failure to deliver gas at a major trading pool in the Midwest, notwithstanding the fact that Targa, a marketing company that produces none of the gas it sells, could have met its delivery obligations had it purchased gas from non-affiliate sellers.

The case went to trial on how to allocate Targa's partial gas deliveries in February between the two differently priced FOM and *Gas Daily*

contracts. At trial, MIECO provided evidence that the standard industry practice for partial deliveries by a supplier to one customer under more than one contract was to attribute first the delivered gas "to a monthly fixed-volume, fixed-priced contract." "[O]nce the full volume requirements of that contract [are] met, any remaining amounts are allocated to variable-priced or variable-quantity contracts." Targa argued that instead, Texas Business and Commerce Code § 2.615 allowed gas allocation in any "fair and reasonable" manner, and that *pro rata* allocation of gas across both contracts was "fair and reasonable."

Targa moved for judgment as a matter of law under Rule 50(a), arguing MIECO presented no evidence during trial that showed *pro rata* allocation was unfair or unreasonable. The district court denied the motion, and the jury returned a verdict for MIECO. The district court entered judgment for the parties' stipulated amount of $6,933,814.94. Targa renewed its motion under Rule 50(b) for judgment as a matter of law. The district court denied the motion. MIECO timely appealed the grant of partial summary judgment, and Targa cross-appealed the jury's verdict.

## DISCUSSION

We first analyze issues arising from Targa's failure to deliver all the gas it had contracted to deliver to MIECO during Winter Storm Uri. We then consider the price Targa charged for gas it delivered to MIECO during that storm.

### I. *Partial Summary Judgment on* Force Majeure

We review the grant of a summary judgment *de novo*, applying the same standards as the district court. *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 523 (5th Cir. 1999). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We view evidence and factual inferences "in the light most favorable to the nonmoving party." *Halle v. Galliano Marine Serv., L.L.C.*, 855 F.3d 290, 293 (5th Cir. 2017) (citation omitted).

A choice-of-law provision in the base contract provides that Texas law controls. Under Texas law, "the application of a particular *force majeure* clause depends on the terms the contracting parties freely chose, and each clause must be construed according to its own terms." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 806 (Tex. 2023). Our "primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). "The party seeking to excuse its performance under a contractual *force majeure* clause . . . bears the burden of proof to establish that defense." *Virginia Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

We construe an unambiguous contract as a matter of law and in accordance with its plain meaning. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019); *see Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022). "A contract is unambiguous '[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation." *Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 (5th Cir. 2013) (alteration in original) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). "The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996).

Section 11.3 of the base contract states that there is no right "to the benefit of the provisions of *Force Majeure* to the extent performance is affected by . . . (v) the loss or failure of Seller's gas supply . . . except . . . as

provided in Section 11.2." Section 11.2 itself says that "Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a *Force Majeure*" event. There is no dispute that the winter storm was a *force majeure* event or that the declaration by Targa's affiliates of *force majeure* was itself a *force majeure* event under the base contract. Instead, the dispute is whether the storm caused a loss of gas supply as meant in the base contract. MIECO argues the district court erred in granting partial summary judgment because (1) Targa had no loss of its gas supply, (2) the failure to satisfy its contractual obligations was due to Targa's economic decisions, not Winter Storm Uri, and (3) Targa did not take "reasonable efforts to avoid the adverse impacts of" *force majeure*.

### A. Seller's Gas Supply

Targa invoked *force majeure* based on a loss or failure of its "gas supply." According to MIECO, Targa had no failure in its supply because other sources of gas — aside from Targa's affiliates — were reasonably available to Targa for purchase at the specified delivery point. Therefore, according to MIECO, Targa did not lose its "gas supply" for purposes of invoking *force majeure*. Targa disagrees, insisting its "gas supply" only includes gas from Targa affiliates. As we will explain, we consider both parties to be incorrect as to the meaning of "gas supply."

Under the base contract and transaction confirmations at issue, Targa is the seller of the gas. As mentioned, MIECO is also a seller of gas to Targa, which is relevant to the part of the case tried to the jury. Our interpretive task starts with the meaning of "supply." *See Point Energy*, 669 S.W.3d at 805. One definition is "the quantity or amount (as of a commodity) needed or available" and another is "to make available for use." *Supply*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/supply (last visited Dec. 9, 2025). Another is

"[t]he quantity or amount of something needed or available; the extent of available things needed, demanded, or required . . . [;] [t]he quantity of goods produced or available at a given price or for some specified use or purpose." *Supply*, Black's Law Dictionary (12th ed. 2024).

Recent caselaw sheds additional light on the meaning of "gas supply" in the current context. Last year, we interpreted the meaning of the phrase "Seller's gas supply" to mean the gas "owned or possessed by" the producer. *MIECO, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 721 (5th Cir. 2024) (quotation omitted). That decision was based on New York law and therefore is not unqualifiedly applicable in our analysis of a contract governed by Texas law. *Id.* at 716. Perhaps more importantly, *Pioneer* analyzed the obligations of a gas producer; in that context, this court held the producer–seller did not need to purchase the shortfall from the spot market when, due to Winter Storm Uri, production from its own wells was disrupted. *Id.* at 720–22. This court expressly left open the question of whether "Seller's gas supply" means something different in the context of a middleman supplier. *Id.* at 722. Targa is just such an intermediary.

Also useful is a Texas court of appeals' opinion addressing a seller's argument that "gas supply" referred "only to those sources internally designated by the seller." *Virginia Power*, 297 S.W.3d at 405–06 (emphasis omitted). The contract itself, though, did not identify specific supply sources. *Id.* at 406. Further, the evidence showed that Apache had available gas from its other wells that were not affected by the hurricanes, even though such gas was not internally allocated to the Virginia Power contract. *Id.* at 407. Those facts left a factual question as to Apache's available gas supply. *Id.* at 408. Only if the contract provided for a limitation on the source of gas would there be a limit that could excuse performance. *See id.* at 406–08. Nevertheless, there was one limit the trial court found that was neither challenged nor analyzed on appeal, namely, that the seller "was not legally

obligated to purchase gas on the spot market to meet its contractual commitment." *Id.* at 407 n.13. The authority for the trial court's holding on the uncontested issue about the spot market is the opinion we discuss next that was issued by the same court of appeals.

Both the *Virginia Power* court and Targa here find persuasive the decision in *Tejas Power Corp. v. Amerada Hess Corp.*, No. 14-98-00346-CV, 1999 WL 605550 (Tex. App.—Houston [14th Dist.] Aug. 12, 1999, no pet.). There, the contract defined *force majeure* as including "an act of God 'or any other cause of like kind not reasonably within the [seller's] control . . . and which, by the exercise of due diligence of such party, could not have been prevented or is unable to be overcome.'" *Id.* at *3 (alterations in original). Like Winter Storm Uri, "abnormally cold weather caused gas wells to begin freezing," which led to supply interruptions. *Id.* at *2. We find no explanation of whether the seller, Amerada, was a producer or a purchaser of production from others. Tejas argued Amerada could have bought spot market gas to fulfill its obligations and that *force majeure* was not properly invoked. *Id.* at *2. The court disagreed, reasoning "the plain wording of the contract" showed "that this [was] the very obligation that Amerada sought to avoid by inclusion of the *force majeure* clause in the cont[r]act." *Id.* at *3. The court determined Tejas's interpretation would render the *force majeure* clause meaningless because it would require Amerada to meet its contractual obligations "[s]o long as gas could be procured anywhere in the world, at any price." *Id.*

We obtained the contract from the *Tejas* record and found it was not an NAESB form contract. Indeed, its execution in December 1994 seems to have predated the first standard forms by NAESB or any predecessor. The *force majeure* clause refers to either party's being "rendered unable . . . to carry out its obligations under the Contract," then later refers to suspension of the obligations "during the continuance of any inability." The definition

of *force majeure* in the contract includes "any other cause of like kind not reasonably within the control of the party claiming *force majeure* and which, by the exercise of due diligence of such party, could not have been prevented or is unable to be overcome." Finally, the contract provides that *force majeure* does not include the "failure of specific, individual wells or appurtenant facilities in the absence of a *force majeure* event broadly affecting other wells in the same geographic area." Thus, when the *Tejas* court held that the "plain wording of the contract" showed there was no need to purchase gas on the spot market, it was not relying on contractual language explicitly referring to the spot market.

We now return to the language of the contract in this case. It requires "reasonable" efforts, which would not require a party to meet its contractual obligations by searching far afield for a supply of gas. On the other hand, nothing in the contract expressed an intent to limit Targa's gas supply to gas from Targa's affiliates. In *Virginia Power*, the seller argued it could limit what would count as available sources of gas for evaluating *force majeure* to the specific wells it had internally identified to fulfill its different contracts. *See Virginia Power*, 297 S.W.3d at 405–06. The court disagreed, as "the parties *could have* inserted a specific supply source in" a special condition or a subsequent transaction confirmation, but they did not. *See id.* Similarly, there is no special provision here regarding the source of supply.

To support a loss of supply, Targa relies on a declaration by Benjamin Branstetter, one of its vice presidents. Declaration supplies the following information. During Winter Storm Uri, Targa's "gas supply" for deliveries to customers on the NNG pipelines came from these sources: (1) Targa's affiliates, Targa Midstream Services LLC ("TMS") and Targa Pipeline Mid-Continent WestTex LLC ("WestTex"); and (2) Oasis Pipeline.

No. 23-20567

As to those affiliates, Targa had "Natural Gas Purchase Agreements with TMS and WestTex that were in effect prior to and during Winter Storm Uri."[2] The agreements provided that

> TMS and WestTex agree[d] to sell and deliver and Targa agree[d] to purchase and receive all of the gas owned or controlled by TMS and WestTex that is produced from and/or processed at [specified] plants . . . that is not otherwise committed by TMS or WestTex for sale to third parties.[3]

On a typical day, Targa received far more gas from TMS and WestTex than was necessary to meet its obligations to customers on the NNG Pipeline. We mention here that MIECO considers that part of the declaration as telling an incomplete story, as the "NNG Pipeline accounts for only 13 to 18 percent of its overall sales." Thus, what Targa gets from affiliates is far from its sole, usual source of gas to satisfy its contractual commitment to MIECO.

The second source of supply came from a third party, Oasis Pipeline. "[O]n February 12, 2023, as part of its efforts to prepare for the storm, Targa entered into a Transaction Confirmation with . . . Oasis . . . to purchase 20,000 MMBtu of gas at the Waha pool on NNG each day from February 13 through 16."

---

[2] Targa Resources is a conglomerate with several different subsidiaries, including Appellee/Cross-Appellant, Targa Gas Marketing, LLC ("TGM"). TMS and WestTex are gathering and processing subsidiaries of Targa Resources.

[3] Gas producers send raw gas to WestTex's plant for gathering and processing to create residue gas. *Cf. Pioneer*, 109 F.4th at 714. Producers such as Targa who market their own gas will allow WestTex to keep a portion of the residue gas as payment for the processing, also known as taking the gas in kind. *See id.* Aside from the gas taken in kind, TGM received the full output of TMS and WestTex.

We do not interpret the Branstetter Declaration as asserting anything other than during the winter storm, Targa limited its gas supply for fulfilling its contractual commitments to the sources named in the Declaration. It is not evidence that such sources were the only ones available or that any other sources on which it had usually relied became unavailable during the storm.

We next define the contractually relevant sources of supply. One source was the affiliates. Their declaration of *force majeure* is relevant to one of the *force majeure* provisions. As mentioned before, Targa may declare *force majeure* under the base contract when "an Affiliate supplying or receiving the Gas delivered or to be delivered under this Contract" has declared *force majeure*. Targa contends this provision applies here because two affiliates — TMS and WestTex — provided much of its gas supply for deliveries on the NNG Pipeline and both declared *force majeure* during Winter Storm Uri. Targa argues that because this provision regarding affiliates contains no "reference to the availability of gas from other sources," it proves "the parties plainly agreed that Targa's performance would be excused by the failure of the gas supply coming from Targa's Affiliates." A bit too much weight is being given to the provision. The affiliates' declaration is effective as a *force majeure* event, but Section 11.3 of the base contract provides that the benefits to Targa of *force majeure* exist only "to the extent performance is affected" by such an event, and the relevant effect on performance under Section 11.3(v) is that which arises from "the loss or failure of Seller's gas supply." Therefore, Targa's being excused from performance is limited by the extent of the loss of its gas supply. The loss from the affiliates is a partial loss of supply, but we must continue to consider how to define "gas supply" under the contract.

Targa minimizes its reliance on third-party suppliers as part of the gas supply to fulfill its contractual obligations. Despite this, record evidence supports that it was Targa's usual practice to receive gas sufficient to fulfill

its contractual obligations from a variety of sources. Targa admits in briefing that it purchased an average of 29 percent of its gas from non-affiliates over a seven-year period. Moreover, an employee of Targa stated that, "on a daily basis," Targa would purchase gas from between 25 to 50 entities. A former gas marketer for Targa explained that the company has purchased gas from third parties to make up shortfalls from "the fluctuations of how gas flows," often driven day-to-day by the "output of the [affiliate] plant." One question to that witness was "if the plant output was less than expected then you would go into the market and purchase gas to make up the difference." The answer was: "Potentially, yes." The "market" as we understand the answer was the daily market, the "spot market" that Targa refused to go into during the winter storm.

MIECO argues that because Targa had been purchasing gas to fulfill its contractual commitments from a variety of sources prior to the winter storm, its decision to limit its purchases during the storm was simply an economic decision, not one caused by an actual loss of supply from these other sources. That might be true if the other, usual sources still had gas available. For example, we know that Targa continued to purchase gas, though in lower quantities, from non-affiliate MIECO. In the district court, Targa produced transaction confirmation memos indicating long-term base contracts with at least two other non-affiliate entities. Neither party, though, has directed us to any part of the record that reveals whether the gas Targa usually purchased from nonaffiliates to fulfill its contracts with MIECO was under FOM contracts, some other form of contract not discussed in this case, or were purchases on the spot market. There is enough in the record to support that at least some of the purchases each day before the winter storm were on the spot market. That then requires us to consider whether caselaw or the contract obligated Targa to continue to purchase some of its gas on the spot market at what then were greatly inflated prices.

14

Some guidance is given by our *Pioneer* opinion. Though it concluded that the phrase "Seller's gas supply" was unambiguous, the court also analyzed the proper result if that phrase were held to be ambiguous.[4] *Pioneer*, 109 F.4th at 722. It considered the history of the NAESB form contract and the drafting committee's "repeated[] reject[ions] [of] amendments [that were] in line with MIECO's interpretation" that *force majeure* could not be declared unless the spot market was unavailable. *Id.*

> In 2005, . . . the committee rejected a proposal to limit *force majeure* "to instances where the pooling point operator announced a *Force Majeure* event" — which would essentially require spot market gas to be unavailable and performance therefore impossible. The next year, the committee rejected arguments that the base contract's *force majeure* provisions were "overly broad" and imposed a "undefinable level of risk on buyers" because they would "allow a gas supplier ('Seller') to claim that a localized event affecting only a single production facility impedes its ability to perform, even at highly liquid delivery points." And after Uri, the committee again rejected proposed amendments seeking to (1) limit *force majeure* to instances where the gathering hub declared *force majeure* and (2) define "gas supply" as either the source designated in the transaction confirmation or, if no source was designated, all reasonably available alternative sources of supply.

*Id.* (citations omitted). "If 'Seller's gas supply' included spot market gas," this court concluded, "then a *force majeure* declaration would already require what each of these failed amendments sought to achieve." *Id.* It is also true that we do not know why the amendments were rejected, reasons that could range from the amendments' being superfluous to their being pernicious.

---

[4] No party argues before this court that there is ambiguity in the term "gas supply."

There is also Texas caselaw on whether a seller of natural gas must purchase on the spot market during a *force majeure* event. We have already discussed two relevant authorities as to this issue. *See Virginia Power*, 297 S.W.3d at 397; *Tejas*, 1999 WL 605550, at *2–3. In both, the courts held that in response to a *force majeure* event, a seller of gas did not need to enter the spot market. The *Virginia Power* decision is like *Pioneer* in that the seller was a producer. The *Tejas* decision does not categorize that seller. In addition to that uncertainty, the Supreme Court of Texas has not spoken on this issue, which means *Virginia Power* and *Tejas* are not controlling as to Texas law. *See Escalante v. Lidge*, 34 F.4th 486, 493 n.9 (5th Cir. 2022) (stating that "when determining state law, we are not bound by the state's intermediate courts"). Though we are not bound by intermediate-court opinions, they do guide us in our evaluation of Texas law.

We have not yet discussed a United States district court opinion from Texas that analyzed the relevance of the spot market when applying a *force majeure* clause during Winter Storm Uri. *LNG Ams., Inc. v. Chevron Nat. Gas*, No. H-21-2226, 2023 WL 2920940, at *7–8 (S.D. Tex. Apr. 12, 2023). There, too, the opinion is not controlling, but it is another court's view of these issues that is worth considering. There are several distinctions in the case, including different contractual provisions, but the opinion discussed the spot market. "If the existence of a spot market precluded *force majeure*, a well-freezing storm would never qualify unless all suppliers lost virtually all of their production" that was to be delivered to the relevant pipeline. *Id.* at *8. The court supported that statement with a footnote that referred to other "courts [that] have declined to read *force majeure* clauses as requiring unavailability of replacement gas [on the spot market], stating that the force majeure clause would be effectively meaningless." *Id.* at *8 n.66 (first citing *Ergon-W. Va.*, 706 F.3d at 424 n.5; and then citing *Tejas*, 1999 WL 605550, at *3).

This review of the available authorities leads to the following conclusions. In reaching them, we cannot follow each of the prior opinions we have discussed because of their inconsistencies. First, because Targa was not a producer, we consider the relevant gas supply under the base contract to consist of more sources than was the case in *Pioneer* or *Virginia Power*. Without a contractual definition to guide us, but with some useful caselaw, we hold that the gas supply under the base contract was the sources for gas that Targa, in the usual course of business, had been accessing under these two "transaction confirmations" since October 2020. We consider the "gas supply" to be the usual gas supply through the life of the confirmations up until that time. The period immediately before Winter Storm Uri, when Targa and the market were reacting to a period of imminent crisis, is not part of the relevant usual course of business. There is not clarity as to what those sources were, but because this part of the case is here on summary judgment, we conclude that Targa failed to carry its burden of showing no genuine dispute of material fact that its gas supply had been lost. Targa has proven, though, that because the affiliates declared *force majeure*, it did suffer a loss of some supply under the terms of the base contract. If the remainder of the supply was under FOM or some other form of contract, Targa must show the extent to which that supply was lost. Once the loss is shown, any obligation to replace a loss of supply from affiliates or other sources would arise from the "reasonable efforts" provision we will discuss later.

Finally, to the extent Targa historically relied daily on the spot market at the agreed-upon Demarc location for delivery, then the fact the market was demanding a much higher than usual price falls into the category of "economic hardship" under Section 11.3(iii) of the base contract and does not itself excuse performance, unless it can show that supply was also lost. This means we find no categorical exclusion of the spot market as a source of

17

supply after a declaration of *force majeure* if the spot market was a meaningful source of supply during normal times.

We acknowledge that some nonbinding caselaw already discussed gives support to a conclusion that not having to enter the hyper-priced spot market during a weather calamity is exactly what a *force majeure* provision is intended to prevent. In this case, though, *force majeure* requires a loss of gas supply, and another provision prohibits using economic hardship as a barrier to continuing to perform under the contract. Regardless of some contrary court opinions, we conclude that, first, if in the usual course of fulfilling its obligation to MIECO under the two agreements, Targa had relied on the daily market for a portion of its gas supply, and, second, should gas in some amount have still been available there, then the quantity of gas supply it had routinely been purchasing on the spot market was available.

Nonetheless, we agree with the cited caselaw that there was no obligation to search for gas in unusual places. The spot market that Targa generally used to comply with these obligations to MIECO before the storm is the relevant daily market for determining whether there had been a loss of that portion of the gas supply. This holding emphasizes the need to determine whether the *Seller's* gas supply, *i.e.*, the supply it has been using to perform under the contract, has suffered a total loss (a "failure" under the base contract) or a partial loss.

We have just determined that the spot market was part of Targa's "gas supply" under the contract. There is more to the analysis of whether Targa had to purchase gas there during the winter storm, and so we move on.

### B. *Caused by* Force Majeure

We also give attention to causation. Section 11.1 provides that "neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was *caused* by *Force Majeure*." According

to MIECO, Winter Storm Uri was not the cause of Targa's nonperformance because the "evidence establishes that Targa could have fully performed had it continued its standard business practice of purchasing gas from third parties to meet its delivery obligations." In response, Targa argues that it need only show that Winter Storm Uri was a "but-for" cause of its non-performance, as opposed to a direct or proximate cause. Targa quotes a decision by the Supreme Court of Texas explaining that a but-for cause standard has "no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 308 (Tex. 2015) (quotation marks omitted) (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 581 (Tex. 2007)). In Targa's view, the summary judgment evidence "easily satisfies" that "lenient" standard. We reject that view.

Targa's effort at defining causation is an effort to rewrite the base contract. Contract terms set out the obligations if a *force majeure* event occurs. The delivery obligations are not completely excused because there was a winter storm somewhere in the causal chain. The contract mandates reasonable efforts, and if but-for causation is enough, then the whole structure of the *force majeure* clause collapses. *See id.* The issue of reasonable efforts remains.

### C. Reasonable Efforts

Under the parties' contract, the party claiming *force majeure* must "make reasonable efforts to avoid the adverse impacts of a *Force Majeure* and [must] resolve the event or occurrence once it has occurred in order to resume performance." The district court made no findings as to what efforts, if any, Targa made or should have made "to avoid the adverse impacts of a *Force Majeure*" event. MIECO preserved the issue by making arguments on reasonable efforts in the district court.

19

We earlier discussed our *Pioneer* opinion and its analysis of "gas supply." The opinion also held that performance did not need to be impossible for *force majeure* to apply. *See Pioneer*, 109 F.4th at 718. Instead, the seller's duty under the contract was to engage in "reasonable efforts." *Id.* at 725. We held that the grant of summary judgment was error because, though there had been a loss of the relevant gas supply, the district court did not determine whether the seller "made reasonable efforts to overcome Uri's effects." *Id.* at 727. A finding on the factual issue of the reasonableness of the seller's efforts would determine whether performance was excused. *Id.* The court considered the option of the seller's purchasing gas on the spot market, separate from the court's analysis as to whether spot-market gas was included within "gas supply," and held that whether such purchases were reasonable was a fact question. *Id.* at 726–27. We remanded for fact finding on that question. *Id.* at 727.

Those same fact questions exist here. It does not matter that *Pioneer* was decided under applicable New York law because Texas law supports the same result. Indeed, we previously interpreted a *force majeure* provision under Texas law and determined that "[t]he word 'reasonable' is not ambiguous." *Ergon-W.*, 706 F.3d at 425. Instead, "[w]hen it modifies other terms in a contract — reasonable time, reasonable value — it is used by the parties to designate that specific time, value, or dispatch that 'would be thought satisfactory to the offeror by a reasonable man in the position of the offeree.'" *Id.* (quoting *Christy v. Andrus*, 722 S.W.2d 822, 824 (Tex. App.— Eastland 1987, writ ref'd n.r.e.)). It creates "a question of fact that must be answered by looking to the circumstances of the case, including 'the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade.'" *Id.* (quoting *Christy*, 722 S.W.2d at 824). We have found some uncertainties in the parts of the record cited to the court on precisely where Targa obtained gas other than from

affiliates in the months before Winter Storm Uri. What Targa's "reasonable efforts" under Section 11.2 of the contract should have been "to avoid the adverse impacts" of the loss of some or most or all of its gas supply must be developed on remand.

We conclude that summary judgment on the issue of *force majeure* was error. There is no evidence cited to this court as to what purchases Targa made from usual suppliers other than affiliates, whether such purchases were still available during the winter storm, what was available on the spot market, and what in general would have been reasonable for Targa during the winter storm. We therefore reverse the grant of summary judgment on the issue of *force majeure*.

We now examine the jury verdict on the issue of allocation of what Targa did deliver under the contract.

## II. *Jury's Verdict*

The jury found that, in the event of a partial delivery, Targa was required when billing MIECO to allocate all available gas to the cheaper FOM transaction before allocating any gas to the more expensive *Gas Daily*. Targa cross-appeals the jury's verdict, arguing the district court erred in denying its Rule 50 motion because MIECO did not present legally sufficient evidence that *pro rata* allocation Targa used was "unfair" or "unreasonable," and MIECO did not prove every element of "usage of trade." Targa further contends that the district court erred in its jury charge because it (1) failed to instruct the jury to consider whether Targa's *pro rata* allocation was "fair and reasonable," (2) failed to instruct the jury on both elements of MIECO's "usage of trade" claim under Texas Law, and (3) combined all three disputed delivery dates — February 14, 15, and 19 — into a single question.

We first consider the denial of the Rule 50 motion.

### A. Rule 50 Motion

We review the district court's denial of a motion for judgment as a matter of law *de novo*, applying the same standard as the district court. *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016). "A motion for judgment as a matter of law in a case tried by a jury . . . 'is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.'" *Heck v. Triche*, 775 F.3d 265, 272 (5th Cir. 2014) (quoting *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995)). Although we employ *de novo* review, "our standard of review with respect to a jury verdict is especially deferential." *Brown v. Bryan County*, 219 F.3d 450, 456 (5th Cir. 2000). We draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party. *Heck*, 775 F.3d at 273. This court will not "reverse a denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence." *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016) (quoting *American Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 488 (5th Cir. 2004)). "We reverse 'only if the evidence points so strongly and so overwhelmingly in favor of the moving party that no reasonable juror could return a contrary verdict.'" *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (quoting *Travelers Cas. & Sur. Co. of Am. v. Ernest & Young LLP*, 542 F.3d 475, 482 (5th Cir. 2008)).

The parties agree that the base contract does not address how to allocate partial deliveries between two transaction confirmations that are priced differently. The jury was tasked with determining whether Targa "failed to comply with the contracts with MIECO" by allocating gas *pro rata* between MIECO's FOM and *Gas Daily* contracts when billing MIECO, instead of prioritizing MIECO's FOM contract. MIECO presented evidence of trade usage and digital messages with Targa's gas trader. The jury found that Targa was required to allocate all available gas to the cheaper

FOM transaction before allocating any gas to the more expensive *Gas Daily* transaction. On appeal, Targa argues (1) the jury should not have considered trade usage, or, alternatively, (2) there was insufficient evidence of trade usage.

### 1. *Considering Trade Usage*

"A contract for the sale of oil is a contract for the sale of goods under the Texas Uniform Commercial Code," and the relevant UCC sections are in what the legislature christened the Texas Business and Commerce Code. *Anadarko Petroleum Corp. v. Williams Alaska Petroleum, Inc.*, 737 F.3d 966, 969 (5th Cir. 2013). The parties agree that their base contract is a fully integrated agreement, as evidenced by the contract's merger clause. Section 2.202 of the Texas Business and Commerce Code provides:

> Terms . . . which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> > (1) by course of performance, course of dealing, or usage of trade (Section 1.303); and
> >
> > (2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

TEX. BUS. & COM. CODE § 2.202. According to Targa, MIECO improperly relied on trade usage to contradict or add new terms to the integrated contract.

We start our analysis with the fact there is no contractual term for trade usage to contradict because, as Targa concedes, the base contract does

not address how to allocate partial deliveries between two transaction confirmations that charge different prices.

As for additional terms, the Texas Business and Commerce Code provides that terms "set forth in a writing intended by the parties as a final expression of their agreement . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but *may be explained or supplemented* . . . by course of performance, course of dealing, or usage of trade." *Id.* § 2.202 (emphasis added).

Targa argues that trade usage here results in adding a term, *i.e.*, it is providing the procedure of fully satisfying the delivery obligations under the fixed-price contract before allocating for accounting purposes any of the delivery to the much-higher daily-price contract. It relies on a Texas Supreme Court decision that held "evidence of surrounding facts and circumstances, including evidence of industry custom and usage, cannot be used to add, alter, or change the contract's agreed-to terms." *Barrow-Shaver*, 590 S.W.3d at 485. Even so, later in that opinion, the Court qualified its earlier statement this way:

> In addition to our precedent, the Restatement also supports that courts cannot rely on evidence of industry custom or usage to add a term *that is not essential to an otherwise enforceable agreement. See* Restatement (Second) of Contracts § 221 (Am. Law Inst. 1981). "An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage." *Id.* A court may only rely on industry custom or usage when "in the absence of usage," it would "supply a reasonable term." *Id.* § 221 cmt. a. A court may only "supply a reasonable term" when it is essential to enforcing an otherwise unenforceable agreement. *Id.* § 204

("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

*Id.* at 487.

Here, the parties had not provided in their contracts for allocating the delivery of gas between their two different transaction confirmations. The agreement for delivery of gas was enforceable, but it needed a reasonable term for the result of a *force majeure* event that prevented full compliance with the two agreements.

"Evidence of custom and usage is admissible to add to a contract that is silent on a particular matter." *Energen Res. MAQ, Inc. v. Dalbosco*, 23 S.W.3d 551, 557 (Tex. App.—Houston [1st Dist.] 2000). Because the parties' contract was silent as to how to allocate partial deliveries, the jury could properly consider usage of trade.

### 2. *Sufficiency of Evidence of Trade Usage*

Alternatively, Targa contends MIECO presented insufficient evidence of trade usage by not showing "its alleged usage of trade was 'known' to Targa or that Targa 'contracted with reference to it.'" MIECO responds by arguing it was not required to prove Targa's actual knowledge of trade usage because the practice of allocating gas to FOM first was "so generally or universally well-known and used in the industry that [Targa was] charged with knowledge of its existence," enough to raise "the *presumption* that they contracted with reference to it." *American Akaushi Ass'n v. Twinwood Cattle Co. Inc.*, 2025 WL 450750, at *21–22 (emphasis added). Our quote from *Barrow-Shaver* requires that "each party knows or has reason to know of the usage." *Barrow-Shaver*, 590 S.W. 3d at 487. Actual knowledge is not required.

"A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts." TEX. BUS. & COM. CODE § 1.303.

Targa argues that "[t]he testimony at trial demonstrated that Targa had no awareness of MIECO's alleged usage of trade," thus the jury lacked a basis to find MIECO's proposed usage of trade under Texas law. Targa maintains that MIECO must prove "two distinct elements": (1) the trade usage was "generally known" within the industry; and (2) the trade usage was *actually* known to the parties. Not so. MIECO had to show that the usage of trade was "*either* . . . known personally" or was "so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it." *Virginia Power*, 297 S.W.3d at 406 (emphasis added) (quoting *State Nat'l Bank of Houston v. Woodfin*, 146 S.W.2d 284, 286 (Tex. Civ. App.—Galveston 1940, writ ref'd)). Denial of knowledge by a party cannot be controlling.

MIECO insists that sufficient evidence of a "general and universal" industry practice was presented to the jury through, among other things: (1) trial testimony from their expert witness stating that allocating gas FOM-first to a single customer was standard practice in the oil and gas industry; (2) testimony from MIECO's trader confirming that this was standard industry practice; (3) an electronic chat showing Targa's trader recognized that any available gas would be attributed to the FOM contract; and (4) an electronic chat evidencing that, from February 17 onward, any available gas would be delivered solely under the FOM contract because neither party nominated gas to be delivered under the *Gas Daily* contract.

At trial, MIECO's trader Cory Rowan testified that, over his past 20 years of experience with trading in the natural gas industry, no counterparties had ever suggested that available gas should be attributed proportionally, rather than to the FOM transaction first. Expert witness Mark Eisenhower, a general manager at MIECO, testified that he had worked in natural gas trading for more than 20 years. He averred that prioritizing the "gotta-have it, first-of-the-month" orders was standard practice in the oil and natural gas industry, and that this practice ensured gas availability "each and every single day, 365 days a year." He testified that there would have been no need to include a contractual provision detailing gas allocation between FOM and *Gas Daily* contracts, because "there would be no reason to identify anything out of the ordinary if it's already traded industry standard." He explained that, if allocations went proportionately to each type of contract, as Targa proposed, "without a doubt end users would be paying a lot higher price for their commodity cost of gas."

Targa's expert witness, Bob Broxon, worked as an energy-trading consultant. He stated that although he had traded natural gas in the past, he had not been involved in buying or selling natural gas for at least 23 years, and the standard North American Energy Standards Board contract had not yet been developed during the years he was trading. He stated that he did not know of any industry practice or custom of allocating to an FOM contract first and then to a *Gas Daily* contract for the same customer.

A Targa gas trader also testified. He was presented with digital messages in which he stated that he told MIECO's trader Cory Rowan he would "try to get as much up there as [he could] for [MIECO's]" FOM. He acknowledged that Rowan wanted to allocate to FOM contracts first, and that this "ma[de] sense for [Rowan's] business," but stated that he believed this was Rowan's own preference as opposed to a well-known industry standard.

Though Targa maintains it "rebutted" a presumption of a universal industry practice with its own evidence, this was a fact issue for a properly instructed jury to decide. We will analyze the instructions next. "When consideration of evidence as to industry custom and usage is appropriate, it is a question of fact for the jury, and it is the province of the jury to weigh witness credibility." *Barrow-Shaver*, 590 S.W.3d at 485. A similar explanation is this: "The existence of an industry-wide 'usage of trade' is a fact question to be determined by the fact finder." *MortgageAmerica Corp. v. Am. Nat. Bank of Aus.*, 651 S.W.2d 851, 859 (Tex. App.—Austin 1983, writ ref'd n.r.e.).

The jury heard extensive testimony stating that allocating gas to the FOM contract first was standard practice in the oil and gas industry. After weighing the available evidence, the jury found that the industry standard was to prioritize FOM contracts over *Gas Daily* contracts when dealing with the same customer. We see no evidence that is "so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable jury could return a contrary verdict." *Heck*, 775 F.3d at 273 (quoting *Foradori*, 523 F.3d at 485 & n.8). The district court did not err in denying Targa's motion for judgment as a matter of law.

### B. *Jury Instructions*

Targa also contends that the district court made various errors in instructing the jury. This court "review[s] challenges to jury instructions for abuse of discretion and afford[s] the trial court great latitude in the framing and structure of jury instructions." *Young v. Bd. of Supervisors of Humphreys Cnty.*, 927 F.3d 898, 904 (5th Cir. 2019) (quoting *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir. 2014)).

To obtain reversal, a party challenging a jury instruction must first show "that the charge as a whole creates substantial and ineradicable doubt

whether the jury has been properly guided in its deliberations." *RSBCO v. United States*, 104 F.4th 551, 555 (5th Cir. 2024) (quotation omitted). Even if the instructions constituted error, however, "we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 290–91 (5th Cir. 2005). If a party contests the denial of a proposed instruction, it must show it "was offered to the district court and correctly stated the law." *Id.* To show the district court should have reached an alternative conclusion, Targa "must demonstrate, at a minimum, that the district court's jury charge did not properly guide the jury according to the controlling law of Texas." *Id.* at 292. "Perfection is not required as long as the instructions were generally correct and any error was harmless." *Id.* at 290–91 (quotation omitted).

### 1. Fair and Reasonable

When an event such as *force majeure* "affect[s] only a part of the seller's capacity to perform," a Texas statute states that the seller "must allocate production and deliveries among his customers" and do so "in any manner which is fair and reasonable." Tex. Bus. & Com. Code § 2.615(2). This statute is a "'gap-filler' provision that applies only in the absence of the parties' specific agreement." *Virginia Power*, 297 S.W.3d at 404. It "provides suppletive provisions excusing non-performance even if the contract is silent in that regard." *PPG Indus., Inc. v. Shell Oil Co.*, 919 F.2d 17, 18 n.2 (5th Cir. 1990).

Targa argues that Section 2.615(2) allowed it to attribute its short deliveries of gas between the FOM contract and the *Gas Daily* contract "in any manner that is fair and reasonable," and that the district court should have instructed the jury "that Targa was entitled to allocate gas in this

manner." It insists that the failure to instruct the jury on this "statutorily-required gap filler provision was error."

Targa cites one district court opinion for the proposition that Section 2.615 applies. *See LNG Ams.*, 2023 WL 2920940, at *10. That decision dealt with an allocation priority between different customers, which as we quoted, is what Section 2.615(2) specifically addresses. *Id.* Here, in contrast, allocation priority was between different contracts for the same customer and is arguably inapplicable. Targa responds that the usage of the plural "customers" in the statute is subject to the interpretive principle that unless there is "a contrary indication, . . . the singular includes the plural (and vice versa)." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 129 (2012). Such general principles must be applied with care, and we see the exception for "a contrary indication" to apply here. The Business Code provision deals with obligations under different agreements with different customers, and the variety of the obligations that could arise with different individuals and entities suggests no general rule should be applied. When it is the same pair of contracting parties, though, a more general trade usage approach makes more sense. We conclude the district court did not err in denying Targa's proposed instruction under Section 2.615(2).

### 2. *Usage of Trade*

The district court instructed the jury to presume that contracts are made "with recognition of industry customs and usages." Targa argues that usage of trade cannot be part of the parties' contract absent evidence of Targa's actual knowledge. The court defined the phrase this way:

> A "usage of trade" is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question.

To establish "regularity of observance," the offering party must demonstrate a dominant pattern of use within the industry.

As discussed already, actual knowledge is not required to show usage of trade. *See Energen Res.*, 23 S.W.3d at 556. Alternatively, Targa contends that the jury "was entitled to consider whether Targa was 'aware of' or 'contracted with reference to' the alleged trade usage — if for no other reason than to determine whether Targa 'rebut[ted] the presumption' of knowledge." Again, MIECO is not charged with showing actual knowledge, but rather the existence of a recognized industry standard. These instructions properly place on MIECO the burden of proving the regularity of the custom it was asserting. We find no error in the district court's instruction.

### 3. *Combined Delivery Dates*

The district court's instruction combined all three disputed delivery dates — February 14, 15, and 19 — into a single question. Before trial, the parties stipulated that the jury was to decide "[w]hether gas that Targa Gas Marketing delivered or should have delivered to MIECO from February 14 to February 19, 2021, should be (a) allocated first to the FOM Transaction and then, after the FOM Transaction has been satisfied, to the *Gas Daily* Transaction or (b) allocated *pro rata* to the FOM Transaction and the *Gas Daily* Transaction."

Targa argues the district court erred in not providing a separate blank for each date. MIECO contends that Targa "mischaracterizes the record" and that the gas traders' reference to "gd17 only," *i.e.*, *gas daily* on the 17th, merely "referred to a day-by-day approach to nominating deliveries on the NNG Pipeline."

As explained above, MIECO introduced evidence that the industry practice was to allocate partial deliveries of gas to FOM contracts first. Targa's arguments suggest the presumption should only apply to one of the three dates — February 17. The jury could, and did, find MIECO's representation of the evidence more persuasive. The jury concluded that MIECO's evidence as a whole raised the presumption that the parties contracted with reference to this industry practice. Because Targa did not show that the jury instructions were wrong under Texas law, we find no error in the district court's instructions.

We AFFIRM the part of the judgment based on the jury verdict, REVERSE the partial summary judgment as to the *force majeure* clause, and REMAND for further proceedings.